IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MIGUEL CARACHURE-GUZMAN

CRIMINAL ACTION FILE NO.

1:18-CR-79-SCJ-JKL-1

## ORDER AND FINAL REPORT AND RECOMMENDATION

This criminal case is before the Court on Defendant's motion to suppress evidence seized from a residence located at 2220 Golden Valley Drive, Norcross, Georgia (the "Residence") as well as evidence seized pursuant to a GPS ping warrant.  [Docs. 44 (preliminary motion to suppress, 51 (amended motion to suppress).]  On January 8, 2019, I held an evidentiary hearing on the motion, at which TFO Howie Spitzer, TFO Joe LeCour, and DEA Special Agent Thomas Ivory testified.  [*See* Doc. 68 (Hearing Transcript).]  References to the transcript are noted as "Hr'g Tr. at __."  Following the hearing, Defendant submitted a post

hearing brief [Doc. 71], the government filed a response [Doc. 74], and Defendant filed a reply [Doc. 78].[1]

Below, I first summarize the material background facts.  Next, I address the parties' arguments relating to the search of the Residence.  Lastly, I address Defendant's challenge to the GPS ping warrant.  For the following reasons, I **RECOMMEND** that the motion be **DENIED**.

## I.    Background

On December 5, 2017, TFO Spitzer, using a confidential source, purchased an ounce of heroin from Defendant in connection with an investigation into drug-trafficking organizations.  (Hr'g Tr. at 6, 8.)  Having identified Defendant as a target, an undercover officer with DEA Miami set up a money pickup (ostensibly, of drug proceeds to be laundered) with Defendant to be conducted at a Home Depot in Flowery Branch in Hall County, Georgia.  (*Id.* at 8-10, 22-24.)  On January 24, 2018, Defendant arrived at the Home Depot in a silver or gray Honda sedan; however, he did not have the full amount of money he was supposed to bring.  (*Id.* at 9.)  Defendant was turned away and instructed to contact the undercover agent

---

[1] Also pending before the Court is Defendant's unopposed motion for an extension of time to file his reply brief.  [Doc. 77.]  For good cause shown, that motion is **GRANTED** nunc pro tunc.

when he had the full amount.  Law enforcement officers then followed Defendant from the Home Depot to the Residence.  (*Id.*)

On February 20, 2018, law enforcement conducted surveillance on the Residence, where they observed a silver or gray Nissan Versa come and go.  (Hr'g Tr. at 12-13.)  While agents were conducting surveillance, TFO Spitzer received a call from DEA Miami stating that Defendant wanted to set up a money pickup for that day.  (*Id.* at 12.)  TFO Spitzer agreed to set up the money pickup and then observed Defendant leave the Residence in the gray Nissan Versa.  (*Id.* at 13.)  TFO Spitzer followed Defendant to an apartment complex and observed an unknown male exit the driver's side of a Mercedes, get into the passenger seat of the Versa with Defendant for approximately a minute, exit the Versa, and then drive away. TFO Spitzer believed, based on the information he had about the upcoming money pickup, that he had witnessed Defendant picking up money.  (*Id.*)

Defendant then drove to a shopping center, where TFO Spitzer observed him meet with at least two other individuals.  (Hr'g Tr. at 13-14.)  TFO Spitzer believed that those meetings were also money pickups.  (*Id.* at 14.)  Law enforcement then followed Defendant back to the Residence, where he backed into the garage and closed the garage door.  (*Id.* at 15.)  TFO Spitzer then received information from

3

the undercover agent in Miami saying that Defendant was twenty minutes away from the pickup location, and that he sounded as if he was indoors.  A few minutes later, the garage door opened, and the Versa left.  (*Id.*)  TFO Spitzer and several other agents followed the Versa.  (*Id.* at 16.)  Before the Versa drove onto Interstate 85, they noticed that another individual, Armando Landa-Hernandez, was driving the car.  The agents eventually performed a traffic stop on Mr. Landa on an I-85 exit ramp and seized approximately $200,000 from the vehicle, 400 grams of heroin from a trap under the front passenger seat, and a digital kitchen scale.  (*Id.*)  TFO Spitzer observed that Mr. Landa was talking on the phone as he was being pulled over.  (*Id.* at 17.)

In the meantime, law enforcement officers, including TFO LeCour, SA Porter, and SA Ivory, who were performing surveillance of the Residence learned of the traffic stop and that contraband had been recovered.  (Hr'g Tr. at 42, 45, 60-61.)  An agent observed a Hispanic male, later identified as Defendant, exit the Residence talking on a cellphone and looking left to right.  (*Id.* at 43.)  As Defendant walked away from the Residence, TFO LeCour approached Defendant in his vehicle, exited the vehicle, and told Defendant to get down on the ground. TFO LeCour had a badge indicating that he was law enforcement.  (*Id.*)  He had

4

his gun drawn at the "low ready down" position, meaning that it was not pointed at Defendant.  (*Id.* at 43-44, 52-53.)   TFO LeCour testified that he approached Defendant in that manner because he knew that there were large amounts of narcotics associated with the Residence, and that based on his knowledge, training, and experience, he knew that firearms and illegal drugs are associated.  (*Id.* at 44.) Defendant complied with the instructions.  (*Id.*)  Defendant was on the ground for eight to ten seconds before SA Porter instructed Defendant to stand back up.  (*Id.* at 44-45.)   Either TFO LeCour or SA Porter performed a brief pat-down of Defendant.  (*Id.* at 46.)  Agents then moved Defendant to the driveway area of the Residence, and he sat in the open sliding-door area of a police van.  (*Id.* at 48, 53-54, 62; Gov't Ex. 3 [Doc. 65-1 at 25].)  Defendant was not handcuffed.  (Hr'g Tr. at 54.)

Defendant, whose primary language is Spanish, appeared to speak limited English, so TFO LeCour and SA Porter radioed SA Ivory, who is fluent in Spanish, to assist with translation.  (Hr'g Tr. at 61-62.)  SA Ivory approached Defendant, identified himself, and asked him questions to determine his proficiency in English or Spanish.  (*Id.* at 63.)  Defendant stated that he spoke very little English, so SA Ivory proceeded to speak with him in Spanish.  SA Ivory determined that Defendant

could understand what he was saying based on Defendant's verbal and physical responses.  Defendant gave no indication that he had difficulty understanding SA Ivory.  (*Id.*)

Having satisfied himself with Defendant's level of proficiency, SA Ivory read Defendant the *Miranda* warnings in Spanish.  (Hr'g Tr. at 63-64.)  Defendant indicated that he understood them and responded that he wished to answer questions.  (*Id.* at 64.)  SA Ivory proceeded to ask Defendant where he had come from, and Defendant pointed to the Residence.  (*Id.* at 64-65.)  SA Ivory also asked him whether a key in Defendant's possession that other officers had observed when Defendant had been first approached belonged the Residence, and Defendant responded affirmatively.  (*Id.* at 65.)  SA Ivory then asked for consent to search the Residence.  (*Id.*)  Defendant verbally responded yes, and he executed a Spanish language DEA consent-to-search form.  (*Id.* at 65-67; Gov't Ex. 4 [Doc. 65-1 at 26].)  The consent to search form provided that was requesting authorization to search the Residence, confirmed that Defendant had not been threatened in any manner, and that he was freely giving consent to search.  (Hr'g Tr. at 66.)  SA Ivory also advised Defendant that he could revoke consent at any time during the search, and asked Defendant if he understood that, to which Defendant responded

6

affirmatively.  (*Id.* at 67.)  SA Ivory did not threaten Defendant in any way, nor did he touch him, strike him, offer him anything in exchange for the consent, or threaten any consequences for the refusal to consent.  (*Id.* at 67-68.)

At that point, agents called for unformed law enforcement officers from the Gwinnett County Police Department.  (Hr'g Tr. at 67-68.)  Once the officers arrived, Defendant, SA Ivory, and other law enforcement officers walked to the Residence.  (*Id.* at 68.)  Defendant, who had the key, opened the door to the Residence and was in the house during the ensuing protective sweep of the premises.  (*Id.* at 69; *see also id.* at 47, 55.)  Several agents and task force officers conducted a safety sweep to locate other individuals who may be hiding in the house who could pose a threat to law enforcement.  (*Id.* at 49-50.)  During the sweep, agents discovered in the master bedroom walk-in closet packaged-up material that appeared to be illegal narcotics and, in another bedroom, a handgun laying on a bed.  (*Id.* at 50, 56-57.)

SA Ivory did not participate in the sweep; instead, he remained by Defendant's side during the search.  (Hr'g Tr. at 69, 75.)  While the sweep was taking place, SA Ivory again reminded Defendant that at any time he could withdraw or revoke consent and that SA Ivory could convey his wishes to the

7

officers conducting the sweep.  (*Id*. at 69.)  At no point did Defendant withdraw or express a desire to withdraw consent.  (*Id.* at 70.)  When the protective sweep was completed, Defendant was placed in handcuffs and transported to a pretrial detention facility in Atlanta.  (*Id.*)

Later that afternoon, TFO Spitzer, with the assistance of a federal prosecutor, drafted an affidavit to apply for a search warrant to search the Residence.  (Hr'g Tr. at 18.)  They ultimately decided to present the warrant to a state court judge, so TFO Spitzer relayed the information to TFO Robert McCoy, who swore out the warrant to search the Residence.  (*Id.* at 19-20, 75; Gov't Ex. 2 [Doc. 65-1 at 14-24].)  Once the warrant was issued, TFO Spitzer and other agents returned to the Residence and executed the warrant.  (Hr'g Tr. at 20.)

**II.     Defendant's Motion to Suppress Evidence Seized from the Residence**

   **A.     The Parties' Arguments**

Defendant argues that his initial stop and detention as he was leaving the Residence was impermissible.  [Doc. 71 at 3.]  Defendant writes:  "Defendant was simply leaving the [Residence] when he was confronted by agents and ordered to the ground at gunpoint.  There was no constitutionally permissible reason to stop Defendant and to hold him at gunpoint until a consent [to search the Residence] was extracted from him."  Defendant maintains that because the initial stop and

8

detention were unreasonable, the subsequent protective sweep, search warrant, and resulting seizures were also tainted, requiring the suppression of seized evidence. [*Id.*]

Defendant also challenges the search warrant on the grounds that the application did not identify which particular law enforcement officer observed what and was drafted to "[i]nsulate the affidavit from challenge as the reader (or the Magistrate) cannot determine who actually saw or did what activity." [Doc. 71 at 3.]

The government responds that, regardless of the constitutionality of the initial stop or the protective sweep, evidence seized in connection with the execution of the search warrant should not be suppressed under the independent source doctrine.   [Doc. 74 at 5-11.]   Next, the government contends that Defendant's stop was lawful because agents had probable cause to believe that he had committed a crime or, alternatively, a reasonable suspicion that he had committed a crime sufficient to justify an investigatory stop, and that Defendant freely gave consent to search the Residence. [*Id.* at 11-18.] Lastly, the government argues that even without Defendant's consent, agents had could have searched the

house without a warrant under the exigent circumstances exception to the warrant requirement.  [*Id.* at 19-20.]

On reply, Defendant argues that the independent source doctrine is inapplicable because, had the agents not interacted with Defendant, there would be "no reliable evidence that any evidence whatsoever would be contained in the [Residence]."  [Doc. 78 at 1.]  Defendant also argues that the decision to obtain a search warrant was prompted by what the agents saw during the initial unlawful entry into the Residence.  [*Id.*]  Defendant further argues that his consent was not voluntary because he was "placed in an agent[']s vehicle where he was questioned"; "[t]he evidence recited by the government does not establish probable cause to arrest the Defendant"; and "the facts demonstrate that this was far from a simple investigative detention, as the Defendant was ordered to the ground at gunpoint."  [*Id.* at 2.]  Lastly, Defendant contends that there was no exigency because there were "plenty of agents at the residence and no indication that anyone else was in the house."  [*Id.*]

The Court first considers the lawfulness of Defendant's encounter with law enforcement followed by whether Defendant voluntarily consented to a search of the Residence.  Next, the Court considers the government's argument concerning

the independent source doctrine.  Last, the Court addresses Defendant's facial challenge to the sufficiency of the affidavit supporting the search warrant for the Residence.

### B.  The Initial Encounter Between Law Enforcement and Defendant Was Lawful.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "There are three broad categories of police-citizen encounters for purposes of [a] Fourth Amendment analysis: (1) police-citizen  exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  An investigative detention requires only reasonable suspicion, whereas an arrest requires probable cause.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  Because the Court finds that there was probable cause to arrest Defendant when TFO LeCour and SA Porter encountered him outside the Residence, the Court need not determine whether the initial detention rose to the level of an arrest. The Court therefore assumes without deciding that Defendant was arrested when he was ordered to the ground.

Probable cause to make a warrantless arrest exists when, at the moment of arrest, the facts and circumstances within the collective knowledge of the officers involved are sufficient to warrant a prudent person in believing a person has committed an offense, is committing an offense, or is about to commit an offense. *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979); *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983).   "'Probable cause' defines a radically different standard than 'beyond a reasonable doubt,' and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction."  *Von Stein v. Brescher*, 904 F.2d 572, 578 n.9 (11th Cir. 1990) (quoting *United States v. Pantojo-Soto*, 739 F.2d 1520 (11th Cir. 1984)).   "The existence of probable cause to arrest is based on objective standards."  *Id.* at 578. Probable cause "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Viewing the totality of the circumstances, the Court readily concludes that agents had probable cause to arrest Defendant when they encountered him outside the Residence.  Before February 20, 2018, federal agents had purchased heroin

12

from Defendant in a controlled buy and had arranged a money drop, to which Defendant failed to bring the full amount of money he was supposed to bring.  After the money drop was called off, agents followed Defendant to the Residence.  Then, on February 20, 2018, agents learned that Defendant was going to attempt another money drop, and they followed him to two locations and observed him interacting with others in a manner consistent with drug trafficking.  Significantly, Defendant returned to the Residence and agents received confirmation that Defendant had told the undercover agent that he was twenty minutes away from the money drop location.  Then, agents observed the Nissan that Defendant had been driving earlier that day leave the Residence.  Agents observed that it was not Defendant who was driving the Nissan.  The driver was observed speaking on the phone at the time of the traffic stop, while back at the Residence, Defendant had emerged, also speaking on a cell phone, looking around.  Defendant began walking away from the Residence.

The government argues—and the Court agrees—that the foregoing facts establish probable cause to believe that Defendant had at least committed the offense of conspiracy to possess with intent to distribute a controlled substance, namely heroin, 21 U.S.C. §§ 841(a)(1), 846.  It is well-established that "the Fourth

13

Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred. *Florida v. White*, 526 U.S. 559, 565 (citing *United States v. Watson*, 423 U.S. 411 (1976)). When TFO LeCour initially approached Defendant, he was outdoors walking away from the Residence, and Defendant makes no argument that was in a place where he had a reasonable expectation of privacy. *See United States v. Santana*, 427 U.S. 38, 42 (1976) (recognizing that even though threshold of a person's residence is a private place under common law, the same location is "public" for purposes of Fourth Amendment analysis where person "was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house").

For these reasons, the Court finds that, assuming (as does Defendant) that he was arrested as soon as he was ordered to the ground by TFO LeCour, the agents had probable cause to arrest him.

### C. Defendant's Consent to Search the Residence Was Voluntarily and Intelligently Provided

A warrantless entry into a suspect's home to search the premises is presumed to be unreasonable. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002). "A search is reasonable and does not require a warrant if law enforcement obtains voluntary consent." *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir.

14

2017).  "Voluntary consent means that the consent to search is 'essentially' the 'free and unconstrained choice' of the occupant."  *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (quoting *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001)).  "Voluntariness is 'not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis' that is based on 'the totality of the circumstances.'"  *Spivey*, 861 F.3d at 1213 (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).  The Eleventh Circuit has identified a handful of factors relevant to determining whether a person's consent to search was voluntary, including the "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'"  *Id.* (quoting *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984)).  The government bears the burden to show that the defendant's consent was voluntary.  *Chemaly*, 741 F.2d at 1352.

Considering the totality of the circumstances, the Court concludes that Defendant voluntarily consented to the search of the Residence.  Starting with the

15

voluntariness of Defendant's custodial status, even though he has not handcuffed, there is no real dispute that he was not free to leave at the time the agents obtained his consent. This factor, therefore, weighs in favor of finding that Defendant's consent was not voluntary. That factor is not determinative, however, and the remaining factors support the conclusion that Defendant freely and voluntarily consented to the search of the Residence. SA Ivory Mirandized Defendant in Spanish and reviewed the Spanish-language consent to search form with him, and Defendant had no difficulty understanding him. Defendant expressed his consent both verbally and in writing. There is no evidence that any of the officers physically threatened or intimidated Defendant to obtain his consent, promised him any benefit if he consented, or threatened any repercussions if he declined to consent. Significantly, SA Ivory advised Defendant that he had the right to refuse consent and twice told him that he could revoke consent at any time. Defendant expressed to SA Ivory that he understood those rights. SA Ivory also asked Defendant if there was anything dangerous in the house that could possibly hurt the officers (such as weapons), any large sums of money, or drugs, to which Defendant responded "no." (Hr'g Tr. at 68.)

16

Defendant contends that his consent was not voluntary because he was "placed in an agent['s] vehicle where he was questioned" and he was "ordered to the ground at gunpoint." [Doc. 78 at 2.] True, TFO LeCour initially approached Defendant with his gun drawn and ordered him to the ground and Defendant was not free to leave at the time that he purportedly consented to the search. But those facts do not weigh heavily against finding of voluntariness here because there is no evidence that TFO LeCour had still had his gun drawn (much less pointed at Defendant) at the time that SA Ivory arrived or at the time that SA Ivory was discussing the consent to search with Defendant. Also, Defendant was not subjected to an overwhelming degree of force. Just ten seconds after being ordered to the ground, Defendant stood back up by himself, he was not touched (other than a brief pat-down), he was not handcuffed, and he was seated on the floor of SA Porter's van with his legs extending out the door and on the ground. The facts of this case pale in comparison with more extreme shows of force that the Eleventh Circuit has found to be not coercive. *See, e.g.*, *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (finding defendant's consent voluntary where he was "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" and "he had invoked his right

to remain silent before consenting to the search"); *United States v. Garcia*, 890 F.2d 355, 362 (11th Cir. 1989) (finding defendant's consent to search car was voluntary even though fourteen law enforcement agents were present when he was arrested and he was handcuffed at time he gave consent); *United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983) (finding consent to search voluntary where defendant was surrounded by four agents, one of whom had his firearm drawn and pointed at the ground).

Considering the totality of the circumstances, then, the Court finds that Defendant's consent was voluntarily given.[2]

**D.    Even if Defendant's Initial Encounter with Law Enforcement Was Unconstitutional, Under the Independent Source Doctrine the Evidence Seized is Not Subject to Suppression**

In the alterative, even if Defendant's initial encounter with law enforcement was unlawful or his consent to search the Residence was not voluntary, the Court concludes that under the independent source doctrine, the evidence seized from the Residence should not be suppressed.

---

[2] Since Defendant's consent was voluntary, it makes no difference whether the agents performed a protective sweep of the Residence as opposed to a full-blown search prior to obtaining the warrant to search the Residence.

The Supreme Court has recognized at least three exceptions to the exclusionary rule involving the causal relationship between the unconstitutional act and the discovery of evidence, where the remedial objectives of the rule do not outweigh its substantial costs:  (1) the independent source doctrine, which allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source; (2) the inevitable discovery doctrine, which allows for the admission of evidence that would have been discovered even without the unconstitutional source; and (3) the attenuation exception, which permits the admission of evidence where the connection between unconstitutional conduct and the evidence is remote or has been interrupted by some intervening circumstance.  *Utah v. Strieff,* 136 S. Ct. 2056, 2061 (2016) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443-444 (1984) (inevitable discovery doctrine); and *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (attenuation doctrine)).

The Court applies a two-part analysis to determine whether evidence seized during the execution of the warrant was discovered independent of an initial illegal entry:

> The first thing we do is excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding. If the remaining or nonexcised information is enough to support a probable cause finding, the second thing we do is determine whether the officer's decision to seek the warrant was "prompted by" what he had seen during the arguably illegal entry. To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered. If the officer would have done so, his decision to seek the search warrant is supported by an "independent source," and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment.

*United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012) (citations omitted).

As noted above, TFO McCoy applied for the warrant to search the Residence. In his affidavit in support of the application, TFO stated as follows concerning the sources of information:

SOURCES OF INFORMATION

The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) the training and observations of myself and other law enforcement agents and officers working closely with me in this investigation; as well as (d) my review of records, reports, and other documents maintained by various law enforcement agencies. Because this Affidavit is being submitted for the limited purpose of securing a search warrant I have not included each and every fact known to me concerning this

20

investigation. I have set forth only those facts that I believe are necessary to establish probable cause.

Unless otherwise noted, when I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) with whom I have spoken whose report I have reviewed.  Wherever in this Affidavit I state a belief, such belief is based on my training an experience and the information obtained through this investigation.

(Gov't Ex. 2 [Doc. 65-1 at 16[3]].)  Then, after describing the purpose of the affidavit, the location and appearance of the Residence, and his experience investigating drug trafficking, criminal enterprises, and gang activities, TFO McCoy provided a statement of probable cause, which stated as follows:

STATEMENT  OF  PROBABLE  CAUSE  FOR  SEARCH WARRANT

In July 2017, DEA started investigating a drug and money laundering organization in Atlanta, Georgia.  Based on the investigation to date, agents have identified the following targets and learned the following structure of the organization as it now exists and operates:

Miguel CARACHURE-GUZMAN (GUZMAN) is a poly-drug (i.e., cocaine and heroin) distributor, who also launders money.  Based on the investigation to date, DEA agents believe that GUZMAN conducts at least some of his business at/out of the TARGET RESIDENCE.

---

[3] The warrant affidavit is not paginated, so I refer to the page numbers automatically generated by CM/ECF when referring to specific portions of the affidavit.

Armando LANDA-HERNANDEZ (HERNANDEZ) is a heroin distributor, who launders money.  Based on the investigation to date, DEA agents believe that believes that HERNANDEZ conducts at least some of his business at/out of the TARGET RESIDENCE.

On February 20, 2018, I, Robert McCoy was informed that federal law enforcement agents started surveillance at the TARGET RESIDENCE at approximately 8:30 a.m.  Agents observed GUZMAN leave the TARGET RESIDENCE in a grey Nissan Versa, Georgia License Plate No. RGK2088. GUZMAN drove to Amber Mill Apartments ("Apartment Complex"), located at 2906 Old Norcross Road, Duluth, Georgia.  At approximately 11:41 a.m. agents observed GUZMAN pull into a parking space at the Apartment Complex and park next to a black Mercedes; a male exited the black Mercedes (UM1) and entered the front-passenger seat of the grey Nissan Versa.  UM1 stayed in the Nissan Versa for approximately one minute, then exited the car.  UM1 promptly returned to the black Mercedes. Both cars then pulled out of their parking spaces and drove in different directions.  GUZMAN exited the Apartment Complex at approximately 11:43 a.m.  Based on my knowledge, training, and experience, I believe that GUZMAN and UM1 participated in an illegal transaction. involving either money or drugs.

At approximately 12:18 p.m., GUZMAN arrived at Plaza Fiesta ("The Plaza") located at 4166 Buford Highway, NE, Atlanta, Georgia 30345.   Agents observed GUZMAN enter the Plaza and exit approximately 15 minutes later, carrying a white plastic bag.  Agents further observed GUZMAN approach a Hispanic male (UM2) standing outside a grey Nissan Altima, Georgia License Plate No. RHP3869.  After shaking hands, GUZMAN and UM2 entered the Nissan Altima—GUZMAN sat in the front-passenger seat and UM2 sat in the driver's seat.  After approximately one minute, agents observed GUZMAN exit the Nissan Altima and return to the Nissan Versa.  Guzman left the Plaza at approximately 12:35 p.m.  Based on my knowledge, training, and experience, I believe that GUZMAN

22

and UM2 participated in an illegal transaction, involving either money or drugs.

Agents then followed GUZMAN back to the TARGET RESIDENCE.  On their way there agents received information that GUZMAN had made arrangements to drop off $200,000 USD at 1455 Pleasant Hill Road, Lawrenceville, Georgia 30044.  Based on information and beliefs that GUZMAN was dropping off the large sum of money to launder it.

At approximately 1:16 p.m., GUZMAN arrived at the TARGET RESIDENCE. GUZMAN pulled into the attached garage, and then the garage door closed behind him.

At approximately 1:30 p.m., agents observed the grey Nissan Versa, Georgia License Plate No. RGK2088, again exit the TARGET RESIDENCE.  Agents followed the Nissan Versa southbound on lnterstate-85.  Agents alerted Georgia State Patrol (GSP) Officers to conduct a traffic stop of the Nissan Versa.  At approximately 1:40 p.m., GSP officers stopped the Nissan Versa on the Pleasant Hill Road exit ramp.

GSP officers made contact with the driver of the Nissan Versa, HERNANDEZ.   While HERNANDEZ initially provided oral consent to search the Nissan Versa, when presented with a consent to search form, HERNANDEZ declined.  So a GSP K-9 handler presented a K-9 for a free-air sniff.  The K-9 indicated to the presence of drug odor from the Nissan Versa.  GSP officers subsequently conducted a probable cause search of the car and located (1) a box in the trunk, which contained approximately $200,000 USD; and (2) a hidden compartment in the front-passenger floorboard, which contained approximately 8 ounces of suspected heroin.  Base[d] on suspicions the house was used for illegal activity agents maintained surveillance on the TARGET RESIDENCE while HERNANDEZ was being stopped by Georgia State Patrol.  At approximately 1:45PM GUZMAN exited the TARGET RESIDENCE and began to walk away from the residence in a fast pace.  At this time agents

made contact with GUZMAN and began to talk with him. GUZMAN stated to agents that he was the only one inside the TARGET RESIDENCE and verbally consented to a search of the residence. GUZMAN unlocked the front door with a key that he had on his person and let the agents inside. Upon agents conducting a protective sweep of the residence approximately 1 kilogram of suspected heroin was in a plastic container on a shelf inside a closet in the master bedroom.

After HERNANDEZ was taken into custody by Georgia State Patrol he stated that he contacted GUZMAN advising he was being stopped by the police.

(*Id.* [Doc. 65-1 at 18-19].)

Turning to the first step of the independent source doctrine analysis, the Court begins by excising the following language from the warrant affidavit, which reflects information that law enforcement obtained from the agents' interaction with Defendant and the subsequent entry into the Residence:

At this time agents made contact with GUZMAN and began to talk with him. GUZMAN stated to agents that he was the only one inside the TARGET RESIDENCE and verbally consented to a search of the residence. GUZMAN unlocked the front door with a key that he had on his person and let the agents inside. Upon agents conducting a protective sweep of the residence approximately 1 kilogram of suspected heroin was in a plastic container on a shelf inside a closet in the master bedroom.

(Gov't Ex. 2 [Doc. 65-1 at 19].) Even when that language is omitted, TFO McCoy's affidavit still establishes probable cause to support issuing the search warrant. "Probable cause exists when under the 'totality-of-the-circumstances . . .

24

there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015) (quoting *Gates*, 462 U.S. at 238 (1983)).  The remaining portions of the affidavit establish that on February 20, 2018: Defendant engaged in two apparent drug/money transactions and then returned to the Residence; in the meantime, agents received information that Defendant had made arrangements to drop $200,000 at a specific location, ostensibly to launder the money; the same vehicle in which agents saw Defendant driving earlier in the day left the Residence again; a traffic stop of the vehicle yielded $200,000 in cash (the same amount of the money drop that agents had been informed of) and heroin; back at the Residence, Defendant emerged from the house and left the Residence at a fast pace; and upon questioning, and the driver of the car told agents he had contacted Defendant to tell him he had been stopped by the police.  (*See* Gov't Ex. 2 [Doc. 65-1 at 18-19].) Moreover, TFO McCoy stated in his affidavit that his training and experience tells him that drug traffickers "commonly hide controlled substances, drug proceeds, and records of their drug transactions in secure locations" such as in their homes and garages.  (*Id.* [Doc. 65-1 at 17].)  These facts are more than sufficient to

25

establish probable cause to believe that the Residence would contain evidence of drug trafficking and money laundering offenses.

Next, the Court turns to whether law enforcement agents would have sought the warrant even if they had not encountered Defendant or entered the Residence. This determination is a question of fact. *See Noriega*, 676 F.3d at 1263. Here, SA Spitzer testified that he went to the scene of the traffic stop, personally observed the contraband, and then proceeded directly to the U.S. Attorney's Office to draft an affidavit to support a search warrant for the Residence. (Hr'g Tr. at 17-18.) It therefore appears that regardless of whether agents had contact with Defendant or entered the Residence, they would have sought the warrant.

In sum, the Court finds that even if the agents' initial interaction with Defendant and entry into the Residence were unlawful, evidence seized at the later search should not be suppressed under the independent source doctrine.

### E.   Defendant's Facial Challenge to the Application Supporting the Search Warrant for the Residence is Without Merit

Defendant also challenges the sufficiency of the search warrant for the Residence on the grounds that the warrant fails to disclose adequately which agent observed what. [Doc. 71 at 3.] This argument—which Defendant wholly fails to support with any authority—is without merit.

26

"'Probable cause exists where the facts and circumstances within the **collective knowledge** of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed.'"   *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (emphasis added) (quoting *Blasco*, 702 F.2d at 1324).   "'Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.'"   *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)).   "To comply with the requirement of particularity and to enable the magistrate to make an independent probable cause evaluation, however, the agent must state in the affidavit that he is relying upon other officers."   *Id.*   An agent satisfies that requirement by stating that the affidavit it is based on information obtained from other law enforcement officers.   *Id.*

Here, as noted in the previous section, SA McCoy made clear that his affidavit was based on information obtained from other law enforcement officers. (Gov't Ex. 2 [65-1 at 16].)   This statement is sufficient to inform the reviewing judge that the affiant did not have personal knowledge of all the information

contained in the affidavit.  Moreover, contrary to Defendant's argument otherwise, TFO McCoy was not required to attribute specific information to particular officers. *United States v. Piquet*, 372 F. App'x 42, 48 (11th Cir. 2010) (rejecting argument that warrant affidavit failed to establish probable cause because it "lacked specific attribution"); *United States v. Lawrence*, No. 1:17-CR-112-SCJ-JFK-1, 2017 WL 4214146, at *7 (N.D. Ga. July 24, 2017), *report and recommendation adopted*, 2017 WL 4182045 (N.D. Ga. Sept. 20, 2017) (same).

For these reasons, Defendant's facial challenge to the sufficiency of the warrant and application fails.

### F.    Summary

In sum, the Court finds that, based on the totality of the circumstances, law enforcement had probable cause to arrest Defendant when they encountered him leaving the Residence and that Defendant voluntarily consented to a search of the Residence.  But even if the agents' encounter with Defendant and entry into the Residence were unlawful, the later search pursuant to a search warrant did not violate the Fourth Amendment under the independent source doctrine.  Finally, Defendant's challenge to the sufficiency of the warrant application is without merit.

For these reasons, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from the Residence be **DENIED**.[4]

### III.   Motion to Suppress Evidence Seized Pursuant to GPS Warrant

Lastly, the Court addresses Defendant's motion to suppress evidence seized pursuant to a GPS ping warrant that TFO David McCoy obtained from the Superior Court of Hall County on January 23, 2018 ("the GPS Warrant").  (*See* Gov't Ex. 1 [Doc. 65-1 at 1-13 (application and warrant).]  Defendant challenges the warrant on the grounds that it was obtained from Hall County, which, according to Defendant "was never planned to be part of this case," and that "the spirit of [*Carpenter v. United State*s, 138 S. Ct. 2206 (2018)] would require such a warrant be obtained from a jurisdiction relevant to the case in chief."  [Doc. 44 at 2; Doc. 51 at 2.]

Defendant's argument is both factually and legally infirm.  From a factual standpoint, the application states that an undercover DEA agent arranged for a money drop with an unidentified male using telephone number 770-557-9772 in the Gainesville area, in Hall County, Georgia.  (Gov't Ex. 1 [Doc. 65-1 at 4].)  Thus,

---

[4] In light of these findings, the Court need not, and does not, address the government's alternate argument that exigent circumstances justified a warrantless search of the Residence.  [*See* Doc. 74 at 19-20.]

it appears that there is, in fact, a nexus between Hall County and investigation in this case, and, contrary to Defendant's argument, it was intentional. Likewise, from a legal standpoint, the Court fails to see how the warrant possibly violates *Carpenter*, much less the "spirit" of the case. Despite filing a motion to suppress, an amended motion, a post-hearing brief, and a reply brief, Defendant provides no real argument as to how *Carpenter* has any effect on the GPS Warrant in this case. "'A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented . . . . A court need not act upon general or conclusory assertions . . . .'" *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (alterations in original) (quoting *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985)); *see also United States v. Hakim*, No. 1:18-CR-126-MLB-AJB, 2018 WL 6184796, at *9 (N.D. Ga. Aug. 22, 2018) (concluding that defendant abandoned perfunctory argument that an information should be dismissed due to lack of standing), *report and recommendation adopted*, 2018 WL 4791085 (N.D. Ga. Oct. 4, 2018).

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress be **DENIED** to the extent that it seeks suppression of evidence obtained by the GPS Warrant.

## IV.   Conclusion

For the foregoing reasons, Defendant's motion for an extension of time to file his reply brief is **GRANTED** nunc pro tunc.   [Doc. 77.]   I further **RECOMMEND** that Defendant's Motion to Suppress [Docs. 44, 51] be **DENIED**.

I have now addressed all referred pretrial matters relating to this defendant and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.[5]

IT IS SO ORDERED AND RECOMMENDED this 23rd day of April 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[5] At the pretrial conference in this case, I deferred ruling on Defendant's Preliminary Motion for Severance of Defendant [Doc. 45] to the District Judge, as the motion was based on a possible *Bruton* problem, which would not ripen until closer to trial.  [*See* Doc. 52.]  The motion to sever, therefore, remains pending.